I see Mr. Byrne and I see Mr. Linder. Can you both hear me? Yes, Your Honor. Yes, Your Honor. Thank you very much. Mr. Byrne, you may proceed. Good morning, Your Honors. May it please the court, I represent James Burkhart in this case. The case before the court is unprecedented. This is a case where you had 14 different lawyers in a law firm represent, on one hand, the criminal defendant and accused, Mr. Burkhart, and on the other, the alleged victim in the case, Health and Hospital Corporation. And that conflicted representation, a conflict that the trial court actually found did exist, resulted in what you'd expected to result in, which was an adverse effect on the performance of the lawyers. This is a case where you had a law firm that was fighting a case with one hand tied behind its back. And we demonstrated that at the trial court level, and we demonstrated that the adverse effect manifested itself in three different ways. And I'd like to walk the court through those ways this morning. First, you had a case where you had what I would call case-altering, potentially case-altering impeachment evidence, that Barnes and Thornburg and lead attorney Larry Mackey, who did in fact previously represent Health and Hospital Corporation, the alleged victim, that the law firm never once told Mr. Burkhart he could use in his defense in the case. And this wasn't a case where there was any mystery about how the government was going to attempt to portray Health and Hospital Corporation at an eventual trial. The strategy was going to be to paint Health and Hospital Corporation as an innocent victim that was duped by a greed-driven executive, Mr. Burkhart. Barnes and Thornburg sat on evidence that could have turned that portrayal on its head. What evidence was that? Well, Health and Hospital Corporation, and in fact Matthew Goodwine, the CEO, who was going to be the lead witness, one of the lead witnesses for the government in the case, engaged in a facially deceptive financial transaction with an entity called Formation Capital. And the basic background of this was the hospital, and this was something that Mr. Matt Goodwine was involved with and helped orchestrate, would pay inflated rents to a third party called Formation Capital as an indirect way of paying a fee to Mr. Burkhart. And the scheme was particularly problematic because it would have resulted, in fact may have in fact resulted, in the hospital submitting false reports to Indiana Medicaid. Now this is something the law firm was aware of. It's something that they had available to them. And yet at no point did they tell Mr. Burkhart, Mr. Burkhart, if this case were to go to trial, we have powerful impeachment evidence that could turn the government's portrayal of Health and Hospital Corporation as an innocent victim taking advantage of you on its head. Is that at all a plausible line of impeachment in the context of this case because it would have implicated your client in a massive additional fraud beyond those that he was already charged with? So it strikes me as a highly implausible line of defense. Well, Your Honor, I respectfully disagree. And for this reason, the actual transaction, if you get into the details of it, was such that Mr. Burkhart did not enter into the rental agreements that were inflated. Health and Hospital Corporation was the entity that was inflated rents to Formation Capital, nor was it Mr. Yes, Your Honor. He was the beneficiary. He was the beneficiary. He absolutely was the beneficiary. But if you imagine this playing itself out at any trial, Barnes and Thornburg accuses Mr. Gutwein, the CEO of engaging in a facially deceptive financial transaction. And Mr. Gutwein says, for example, well, no, let me explain to you, Barnes and Thornburg, why that wasn't deceptive. It wasn't deceptive. Yes, we're playing inflated rents, but, you know, there is no real need to disclose it for these following reasons. So you play that line of impeachment out. Barnes and Thornburg's lawyer could have said, well, Mr. Gutwein, if you don't think that was deceptive, that failure to advise your shareholders and failure to advise your board about this potentially deceptive financial transaction, how could you say that Mr. Burkhart was doing something wrong and not disclosing his financial investment interest in vendors? So in a way, to your point, Your Honor, if Mr. Gutwein had defended that transaction as completely above board, Barnes and Thornburg could have used that to help further Mr. Burkhart's mens rea defense. So if Gutwein had defended that transaction, it would have provided very strong ammunition for Mr. Burkhart to use in pursuing his own mens rea defense. So really, it was a win-win scenario, that particular line of impeachment, because either Mr. Gutwein denies that there was anything wrong with it, which he could have utilized, the lawyers could have utilized to defend Mr. Burkhart. Or on the other hand, Mr. Gutwein could have said, yes, yes, okay, but you know, here's my reasoning and the like. And so I do think that was a very critical piece of impeachment. And as any lawyer knows, when you get in a situation where you have a case where you have to sometimes, and it's not the easiest thing to do, attack a victim in a case, an alleged victim in a case by pointing out that, look, they did things that were inappropriate, that can have a real impact on the jury. There's a reason why that strategy exists, and many defense lawyers take advantage of it. But to your point, Your Honor, there's not just one adverse effect here. We had a situation, and this is something that is probably something I've never encountered in a case in my career, where you had, after a criminal defendant pled guilty, after he was sentenced, he actually went and spoke with his lawyer, and he spoke with lead attorney Larry Mackey. And they had a conversation about the fact that he had pled guilty, and about how the fact that Mr. Burkhart had pled guilty meant that questions would not be brought to the public arena about the hospital's use of something called the Upper Payment Limit Intergovernmental Transfer Program, which the hospital was very concerned about coming to light for a variety of reasons. And they have a conversation about that, and Mr. Burkhart says something to the effect of, well, I guess because I pled guilty, the exposure to the hospital has gone away. And remember, this is a hospital that was Larry Mackey's former client, who actually had defended against accusations that the hospital had taken advantage of this program. And Mr. Mackey's response, and this is on a recording, says, yeah, and as far as I'm concerned, I'm glad. I'm glad that your guilty plea means that my other client's use of this federal program will not be brought to light. If that were the motivation of the law firm and the lead attorney, Mr. Mackey, it would have arisen much earlier in the case. The guilty plea was by your client's brother's guilty plea in agreement to cooperate and the COO's guilty plea in agreement to cooperate. There's no link to this other pre-existing attorney-client relationship. There's not even correlation. We can't even get to causation without correlation, but we don't even have correlation here. So the guilty plea is completely decoupled from that. The fact that the longstanding hospital client avoided a risk by your client's guilty plea had no connection to the plea in terms of the advice that was given, and that's the focus of this claim. Well, respectfully, I disagree, Your Honor, for a couple of reasons. One, you had a situation where we're under the Kyler standard. So the question is whether there is an adverse effect on the performance. By saying... Not the outcome of the case, but the attorney's performance and recommendation that it's time to consider a plea because these two co-conspirators have become government witnesses. Yes, and unfortunately in this particular instance, this is another point we raised in our brief, we never had the opportunity at an evidentiary hearing to ask Mr. Mackey what was the motivation for him in giving this advice. Respectfully, I think the motivation for him, a big motivation, and it doesn't have to be the sole motivation under Kyler, was the fact that he had represented Health and Hospital Corporation. Not only that, but that he had represented the CEO of the corporation, which was going to be the lead witness in the government's case against Mr. Burkhardt. And to this day, Your Honor, we have an instance where we received timesheets from the law firm where Larry Mackey is giving advice to Matthew Gutwein in connection with a lawsuit alleging that the hospital had engaged in fraud, a False Claims Act case. To this day, I have no idea what Larry Mackey was advising Mr. Gutwein of because they redacted and blacked out the advice that Larry Mackey was providing to Mr. Gutwein. I have no idea what potential criminal acts Larry Mackey was aware of that Matthew Gutwein committed that could have influenced his advice to Mr. Burkhardt in the context of his guilty plea. But again, you have a situation where looking at this objectively, any lawyer who's defending a criminal defendant should not only tell that defendant, by the way, I previously represented a star witness against you in the case. Oh, by the way, 13 other of my colleagues who are also defending you in this case also represent a health corporation. By the way, Mr. Burkhardt, while we're representing you in this criminal defense action, we've decided to take on another case on behalf of the hospital where a woman, a civil case where a woman is accusing your victim of committing fraud. None of that was told to Mr. Burkhardt. But it's problematic because as any lawyer would do in defending a criminal defendant, you give that criminal defendant options. You give him alternatives. And I understand that one could argue and certainly reasonably argue, well, you know, it's very risky, Jim Burkhardt, Mr. Burkhardt, to go after the hospital about this formation capital transaction. It's very risky to cross-examine aggressively the CEO of Health and Hospital Corporation. But what was particularly problematic here and another adverse effect that we pointed out in the context of this case was the fact that there was a real possibility to actually present a mens rea defense, effectively a trial, that Barnes and Thornburg was going to have to call an FBI agent to the stand to impeach their other client, Mr. Goodwin. Because Mr. Goodwin had made statements to the FBI saying certain things about other vendors not being disclosed to have been represented by the Jacksons. The Jacksons were another manager of the hospital. And it was helpful that FBI testimony, the FBI statements by Mr. Goodwin to the FBI was quite helpful to Mr. Burkhardt. But at a trial, of course, as any lawyer knows, a witness can say, no, you know what, I didn't say that to the FBI agent. The FBI agent got that wrong. And what would that have done? The law firm, Barnes and Thornburg, would have to call the FBI agent to the stand to impeach their own client. And this is something that any trial lawyer knows is a real thing that you have to be prepared to deal with. And unfortunately, in this case, as the discovery record showed, Barnes and Thornburg was not prepared to do that. It had not prepared to identify the federal agent that they would need to call to impeach Matthew Goodwin at an eventual trial. So you have this manifested in multiple ways. And I believe I have just two minutes left. I'd like to reserve that time for any rebuttal, Your Honor. And I thank you for your time. Mr. Linder. Thank you, Your Honor. May it please the court, Nick Linder on behalf of the United States. I would begin with, I suppose, a refutation of where Mr. Byrne began. This case is not unprecedented. Just last summer, this court in U.S. v. Cossia dealt with a case where a law firm, a criminal case, defended a client. And that law firm had a victim in that case was a client of the firm. And in Cossia, the court went through the analysis here appropriately. Same analysis that applies in this case. Mr. Byrne spent a lot of time. But, you know, you've compiled a lot of information about all of the things that Burkhart's lawyers did in their rigorous defense of Burkhart. But I have, I just am very concerned about the one thing they did not do. And that was reveal their representation of HHC. I mean, I take it that you would agree that there was a conflict. How can you not? And that Barnes and Thornburg should have at the least revealed to him that the firm represented HHC. I'm flummoxed by this. Your Honor, we certainly in an ethical sense agree that there is an issue with the firm's lack of disclosure. Their engagement letter did not mention their prior representation. It should have. But did they ever throughout the time? I mean, you know, Mr. Burkhart essentially had an office at Barnes and Thornburg. I mean, he was involved in the smallest minutiae of trial planning, but he didn't know about the elephant in the room. Your Honor, I would a couple of responses to that. First, there is evidence in the record that they did. They didn't conceal their representation of health and hospital. In fact, there are emails where they tell Mr. Burkhart, we did represent health and hospital, and we're going to leverage that prior representation to your advantage. So I don't I don't think the record shows sort of acts of concealment. Secondly, that those sets of facts in any event get to the first element of this claim, which is a conflict. And the district court did find a conflict here. The government chose not to cross appeal on that issue. That's not why we're here. We are not here to defend the firm. We are here to defend the conviction. And that I think the record shows very clearly, as your Honor pointed out, we engaged in, to the extent this case is unprecedented, it's the level of discovery that we engaged in on a 2255 proceeding. The amount of information we received and Mr. Byrne received and ultimately produced for the court. The district court, Barnes and Thornburg's inner workings, their file on this case, which is tremendously voluminous. And what it showed, or what it didn't show, as Chief Judge Sykes pointed out a moment ago, was that there is just no link between this prior representation and any adverse effect on the advice Mr. Burkhart received. So Judge Roger, I hear you certainly. And again, the government did not cross appeal on that point. That said, that's not what this is about here today in our view. This is about whether there's an adverse effect. And that's really the point Mr. Byrne is appealing. I'm most concerned about Guttwein as a witness. Barnes and Thornburg had previously, of course, defended him against charges that he had defrauded Medicaid. Do you think it possible that those lawyers could vigorously cross-examine him and accuse him of lying to a federal agent? Yes, for several reasons. First, as the record showed, and we obtained and discovered and submitted to the court, the firm developed a 64-page, tremendously detailed cross-examination outline that they intended to use with Mr. Guttwein. And in that outline, they sought to develop all of the defense themes that were evident throughout their trial strategy, which were ultimately manifested in a 22-page, single-space draft opening statement that they put together. That certainly did talk about that mens rea defense. It even referenced what they thought Mr. Guttwein would say. And effectively, Mr. Guttwein, well, the defense's use of Mr. Guttwein in making that defense is, hey, they did it too. Or in this case, the Jackson family did it too. So it's okay. And that central point was rife throughout that 64-page outline. So to say that they were unprepared to really go and make their case to Mr. Guttwein is belied by that document. Mr. Linder? Yes. Make your second point. I'll follow up with my question after that. Go ahead. Second, with regard to, you know, disciplining, as Mr. Burns called Mr. Guttwein, or impeaching his credibility, the references to the FBI 302, the agent, you're talking about calling the agent, are also listed contemporaneously throughout that 64-page outline. So to the extent Mr. Guttwein strays from what they anticipated his testimony to be from that 302, they have the reference right there. And the last point I would make is the notion that they would pull punches on Mr. Guttwein is, again, belied by some aspects of that cross-examination outline where they were prepared to ask Mr. Guttwein about extramarital affairs, prepared to ask him about rumored political contributions, unseemly political contributions. I mean, it does not get much more personal than asking a witness about a rumored extramarital affair, a rumor that came from Mr. Burkhardt, as the record showed, put in the record. So the notion that they were pulling punches on Mr. Guttwein, I just think, is belied by the record. Mr. Linder, let me ask you this question. Mr. Burns may want to respond to it, too. I've had some difficulty in preparing for the case understanding the substance of the mens rea defense. And here's where my confusion lies. It seems that, as you all have briefed it, that the idea was to point out that it was very common in these vendor circles for there to be ownership interests that were held by management companies or others, the Burkharts and others of the world. And that that was just industry custom and practice and accepted. I don't see how that gets at the mens rea aspect of this, because the criminal charges were not that the related party transactions were unlawful or that there was some type of failure to disclose. It was a criminal fraud prosecution, wasn't it? That there were fraudulent inflated charges, there were kickbacks and the like. So I don't understand what showing that it was custom and practice for there to be ownership interests of vendors. Why would it have made any difference at all? I'm missing something there, and I can't figure out what I'm missing. The fact that they prepared for that defense, and it may have been and likely would have been unsuccessful, does not mean it wasn't the plausible defense to make in this case. But why wouldn't the government have responded by saying there's no violation of Title 18 by holding an equity interest in a vendor or by failing to disclose a related party transaction? That's not the Title 18 problem.  Indeed, the government was certainly prepared to do that. And in fact, as the mock juries pointed out, they did not find the sort of they did it to defense or the notion of owning outside interest persuasive, particularly when those undercover tapes of his co-conspirator replay. So I agree with you. It was not a terribly successful defense. Cases like this where a co-conspirator has recorded you saying what Mr. Burkhardt said are difficult to defend, no doubt. Yeah, I'm going to ask Mr. Burns this question. I think I'm missing something. I think there's something more to it, and I can't figure out what that is because it's hard for me to believe that there would have been hundreds of hours spent exploring this defense if it's as simplistic as I just described it. They I think I would add one piece of complexity to what you describe. It is the defense is both that it is that they pursue. It is common in the industry to own outside vendor relationships. And the Jackson family, in particular, Jackson family, did not disclose or was not up front about those relationships with health and hospital. And Mr. Burkhardt knew that. But what they say at trial, who cares? We have a it's a fraud case. What the defense would say is, well, that bore on Mr. Burkhardt's intent. He he saw his bosses doing this. Therefore, he thought it was OK. I agree with you. That's not a persuasive defense. That's why the government brought this case. But the problem is that I'm going to be quiet and let you are. The problem is that this is not is not. His defense was not that it was common and accepted in the industry and everybody knew it, that everybody engaged in fraudulent billing and kickback schemes. That's not it. That's that is correct, your honor. That is not it, because it's not true. The evidence doesn't support that. Yeah, go ahead. All right. I'll respond to just a couple of other things. Really, there was a note Mr. Byrne made about Mr. Gutwein being the government's lead witness. That's not accurate. The government's lead witnesses were its cooperators. Of course, Mr. Mazinowski, who did the undercover recordings, was undoubtedly the lead witness in this case. Mr. Burkhardt's little brother, who had turned state's evidence along with the CIO at that time. And frankly, by the by the end of it, the other the last defendant, other than Mr. Burkhardt, also agreed to cooperate. So those are that's the government's evidence in this case. Mr. Gutwein played a small role, would have played a small role. I think the record demonstrates that. When you've got undercover recordings, binders, documents, financial transactions, showing the flow of funds and the purchases of gold bars and private jets, that's the focus of the government's case here. It's not Mr. Gutwein. Lastly, Mr. Byrne mentioned that at a minimum, an evidentiary hearing would be helpful and that they never had an opportunity to ask Mr. Mazinowski. And I do take some umbrage with that. We engage, as I noted, in extensive discovery. I mean, I'm not familiar with this level of discovery in a 2255. And we sought and received 63 pages of verified interrogatories from Mr. Mazinowski. And then we sought to and did depose Mr. Burkhardt. We flew down to Alabama and talked to him for several hours. Mr. Byrne had the opportunity to notice up a deposition of Mr. Mackey at any point. And he didn't do that. So to claim now he didn't have the opportunity, I think, is not correct. Moreover, as Chief Judge Pratt found, the record in this case is fulsome. And more asking Mr. Mackey, given both his own verified statements coupled with their corroboration in the documentary record, the contemporaneous emails and other documents at the time it was made. Again, to your point, Chief Judge Sykes, there's just not evidence of a link between this conflict and any purported adverse effect on this representation. If there are no other questions, thank you very much. Thank you. Mr. Byrne. Yes, Your Honor. And I'll just make a couple of points here. First, this idea that Barnes and Thornburg was prepared to aggressively cross-examine Matthew Guttwein is fanciful. You had a situation, and this is undisputed, where Larry Mackey expressly said to Mr. Burkhart that they were going to have to treat Mr. Guttwein with kid gloves was his terminology. So the idea that a kid gloves cross-examination would result in Barnes and Thornburg accusing Mr. Guttwein of lying to a federal agent makes no sense in the context of that statement about a kid gloves cross-examination. Secondarily, to Judge Scooter's point, this idea of a defense, a mens rea defense, it was effectively that the Jacksons, who were the prior managers of the hospitals, engaged in very similar structuring. And in fact, too, that they profited from this transaction. And one of the key defenses, and one that was presented at sentencing in the component of loss amounts, was that these services were all provided at fair market value. And so at the end of the day, regardless of what was disclosed or not disclosed and kickbacks and how the flow of funds worked, that it was fair market value prices, that it was very common to have structuring like this. And so the Jacksons had the same interest in, for example, Midwest Radiology, which was a company that provided services to Health and Hospital Corporation, and he was just and didn't believe he was doing anything illegal. But this was an honest services fraud style case, and so that's where that came from. But at the end of the day, Your Honor, this is a case where under Rosenwald and Hall, an evidentiary hearing at the minimum, given the precedence of the Seventh Circuit, would be required so we can talk to these 14 lawyers. That's all I have to say to complete my time. All right. Thank you very much. Our thanks to both counsel. The case is taken under advisement, and the court will take a 10-minute recess before calling the third case this morning. Thank you, Your Honors. Have a good day.